Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Max Gershenoff (MG 4648)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs, Government Employees Insurance Co.,*
*GEICO Indemnity Co, GEICO General Insurance Company*
*and GEICO Casualty Co.*

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 1 1 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO.,
GEICO GENERAL INSURANCE  COMPANY and
GEICO CASUALTY CO.,

**CV 11 - 1166**

Docket No.:_____ (    )

Plaintiffs,

-against-

**Plaintiff Demands a Trial by Jury**

NEW HYDE PARK IMAGING, P.C.,

**SUMMONS ISSUED**

ALLEN ROTHPEARL, M.D.,
MANI USHYAROV, D.O.,

   (collectively the "Nominal Owner Defendants"),

**BLOCK, J.**
**CARTER, M.J.**

REUVEN ALON,
YAN MOSHE a/k/a YAN LEVIYEV,
DROR ALON,
US DIAGNOSTIC SERVICES, INC.,
HIGHCROME MGMT. CORP.,
1963 CONCOURSE HOLDINGS, LLC,
WORLD TRADE CONSULTING MANAGEMENT
GROUP, INC., and
NYIC BAR MARKETING, INC.

   (collectively the "Management Defendants"),

Defendants.

---------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.      This action seeks to terminate a massive, ongoing series of interrelated fraudulent schemes perpetrated against GEICO and the New York automobile insurance industry by several physicians, the professional corporations they purport to own, and the unlicensed individuals and entities that actually own and control the professional corporations secretly and in contravention of New York law. Succinctly:

(i)      unlicensed non-physicians purchase the use of the physicians' licenses for a nominal sum or some ongoing payment, then use the physicians' licenses to fraudulently incorporate professional corporations (i.e., New Hyde Park Imaging, P.C. and I.D.F. Medical Diagnostic, P.C.);

(ii)     the professional corporations serve as vehicles through which fraudulent no-fault claims are submitted to GEICO and other New York automobile insurers for radiology services (i.e., MRI studies, CT scans, and x-rays) allegedly provided to individuals involved in automobile accidents in New York ("Insureds");

(iii)    the non-physicians establish "management" companies to create the façade of business relationships with the professional corporations, but actually use the "management" companies to unlawfully own and control the professional corporations, and to siphon away virtually all of the professional corporations' revenues; and

(iv)     in many cases, the physicians who purport to own the fraudulently incorporated professional corporations do not even practice through the professional corporations – instead, the pertinent radiology services are performed by independent contractors but are fraudulently billed to GEICO and other insurers as if they were performed by the professional corporations' employees.

2.      Accordingly, in addition to seeking more than $2,500,000.00 that the Defendants have stolen from GEICO through fraudulent no-fault claims, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $650,000.00 in pending fraudulent claims that have been submitted, or caused to be submitted, by the Defendants through New Hyde Park Imaging, P.C. because:

(i)      New Hyde Park Imaging, P.C. has no right to receive payment for any pending bills submitted to GEICO because the professional corporations was fraudulently incorporated, owned and/or controlled by non-physicians and, therefore, is ineligible to seek or recover no-fault benefits.

(ii)     New Hyde Park Imaging, P.C. has no right to receive payment for any pending bills submitted to GEICO because the professional corporation engaged in unlawful fee-splitting with non-physicians.

(iii)    New Hyde Park Imaging, P.C. has no right to receive payment for any pending bills to the extent that those bills seek payment for the technical component of all radiology services billed to GEICO, because the services were not provided by individuals employed by the professional corporation that submitted the billing;

(iv)     in most cases, New Hyde Park Imaging, P.C. has no right to receive payment for any pending bills submitted to GEICO, to the extent that those bills seek payment for the professional component of all radiology services billed to GEICO, because the services were not provided by individuals employed by the professional corporation that submitted the billing; and

(v)      in most cases, New Hyde Park Imaging, P.C. has no right to receive payment for any pending bills submitted to GEICO because the physician who purported to own the professional corporation does not actually practice through the professional corporation.

3.      The Defendants fall into the following categories:

(i)      Defendants Allen Rothpearl, M.D. ("Dr. Rothpearl") and Mani Ushyarov, D.O. ("Dr. Ushyarov")(collectively the "Nominal Owner Defendants") are physicians licensed to practice medicine in New York. Dr. Rothpearl formerly served as the nominal or "paper" owner of Defendant New Hyde

Park Imaging, P.C., Dr. Ushyarov currently serves as the nominal or "paper" owner of New Hyde Park Imaging, P.C. [1]

(ii)     Defendant New Hyde Park Imaging, P.C. ("NHP") is a fraudulently incorporated New York professional service corporation through which radiology services are performed and billed to insurance companies, including GEICO. NHP nominally has been owned on paper by Dr. Rothpearl and Dr. Ushyarov, but actually always has been owned and controlled by non-physicians. After insurers began to submit verification requests to NHP, certain of the Defendants in this action fraudulently incorporated non-party I.D.F. Medical Diagnostic, P.C. ("IDF") and installed non-party Bhupinder Singh Sawhney, M.D. ("Dr. Sawhney") as its nominal or "paper" owner, in order to continue submitting fraudulent billing to GEICO and other insurers

(iii)    Defendants Reuven Alon ("Alon"), Yan Moshe a/k/a Yan Leviyev ("Moshe"), Dror Alon ("D. Alon"), US Diagnostic Services, Inc. (USDx"), Highcrome Mgmt. Corp. (Highcrome"), 1963 Concourse Holdings, LLC. ("Concourse Holdings"), World Trade Consulting Management Group, Inc. ("World Trade"), and NYIC Bar Marketing, Inc. ("NYIC") (collectively the "Management Defendants") are the non-medical professionals that actually own and control NHP in violation of New York law. In addition, Alon, Moshe, USDx, and Concourse Holdings actually own and control IDF in violation of New York law.

4.      As discussed below, the Defendants at all relevant times have known that: (i) the Nominal Owner Defendants or Dr. Sawhney are not the true owners of NHP or IDF, through which all charges for radiology services have been submitted; (ii) NHP and IDF actually are owned and controlled by non-physicians; and (iii) NHP and IDF are ineligible to submit charges to GEICO for payment of the radiology services because NHP and IDF are not the providers of

---

[1] Bhupinder Singh Sawhney, M.D., who resides in and is a citizen of New Jersey, is not named as a defendant in this action. Dr. Sawhney is a physician who has been licensed to practice medicine in New York since July 19, 2001, and serves as the nominal or "paper" owner of I.D.F. Medical Diagnostic, P.C., which also has not been named as a Defendant in this action. Dr. Sawhney never has practiced medicine through IDF. Like New Hyde Park Imaging, P.C., I.D.F. Medical Diagnostic, P.C. has been used by certain of the Defendants in this action to submit fraudulent claims to GEICO.

4

the radiology services with respect to many of the claims. In addition, the financial and operational relationships between the Defendants deliberately have been created to allow the Management Defendants to secretly own and control NHP and/or IDF, and to illegally split fees by funneling insurance proceeds paid by insurers (including GEICO) to non-physicians. NHP and IDF do not now have, and never had, any right to be compensated for the bills submitted through them to GEICO and to other New York automobile insurers.

5.      The charts annexed hereto as Exhibits "1" and "2" summarize, in part, the fraudulent claims identified to-date that the Defendants submitted, or caused to be submitted, to GEICO through NHP and IDF. The Defendants' interrelated fraudulent schemes began as early as 2006 and have continued uninterrupted since that time. As a result of the Defendants' interrelated schemes, GEICO has incurred damages of more than $2,500,000.00.

## THE PARTIES

### I.    Plaintiffs

6.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   The Defendants

#### A.    The Nominal Owner Defendants

7.      Defendant Dr. Rothpearl is a physician who has been licensed to practice medicine in New York since July 26, 1989, and formerly served as the nominal or "paper" owner of Defendant NHP. Dr. Rothpearl resides in and is a citizen of New York.

5

8.     Defendant Dr. Ushyarov is a physician who has been licensed to practice medicine in New York since January 19, 1996, and currently serves as the nominal or "paper" owner of Defendant NHP.  Dr. Ushyarov resides in and is a citizen of New York. Dr. Ushyarov never has practiced medicine through NHP.

**B.    NHP**

9.     Defendant NHP is a New York professional service corporation with its principal place of business in New York. NHP was fraudulently incorporated in New York on or about March 29, 2005, has been owned on paper by Dr. Rothpearl and Dr. Ushyarov, but in actuality is owned and controlled by the Management Defendants in contravention of New York law. After insurers began to submit verification requests to NHP, Alon, Moshe, USDx, and Concourse Holdings fraudulently incorporated IDF as NHP's replacement, installed Dr. Sawhney as its nominal or "paper" owner, and used IDF to continue to submit fraudulent billing to GEICO and other insurers.

**C.    The Management Defendants**

10.     Defendant Alon resides in and is a citizen of New Jersey.  Alon never has been a licensed physician or medical professional, yet secretly owns, controls, and derives economic benefit from the operation of NHP and IDF in contravention of New York law. Alon also owns and controls Defendants USDx, Highcrome, Concourse Holdings, and World Trade.

11.     Defendant Moshe resides in and is a citizen of New York.  Moshe never has been a licensed physician or medical professional, yet secretly owns, controls, and derives economic benefit from the operation of NHP and IDF in contravention of New York law. Moshe also owns and controls Defendants USDx, Highcrome, Concourse Holdings, and World Trade.

6

12.     Defendant D. Alon resides in and is a citizen of New Jersey.  D. Alon never has been a licensed physician or medical professional, yet secretly owns, controls, and derives economic benefit from the operation of NHP in contravention of New York law. D. Alon also owns and controls Defendant NYIC.

13.     Defendant USDx is a New York corporation with its principal place of business in New York. USDx was incorporated in New York on or about September 6, 2005, and has been used to illegally own and control NHP and IDF and to siphon their revenues to non-physicians.

14.     Defendant Highcrome is a New York corporation with its principal place of business in New York. USDx was incorporated in New York on or about August 10, 2000, and has been used to illegally own and control NHP and to siphon its revenues to non-physicians.

15.     Defendant Concourse Holdings is a New York limited liability company with its principal place of business in New York. Concourse Holdings was organized in New York on or about December 9, 2004, and has been used to illegally own and control NHP and IDF and to siphon their revenues to non-physicians.

16.     Defendant World Trade is a New York corporation with its principal place of business in New York. USDx was incorporated in New York on or about March 21, 2002, and has been used to illegally own and control NHP and to siphon its revenues to non-physicians.

17.     Defendant NYIC is a New York corporation with its principal place of business in New York. NYIC was incorporated in New York on or about February 25, 2002, and has been used to illegally own and control NHP and to siphon its revenues to non-physicians.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive

of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.    An Overview of the No-Fault Laws and Licensing Statutes**

20.     GEICO underwrites automobile insurance in New York.

21.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

23.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for

medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

24.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they were fraudulently incorporated. In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a professional corporation authorized to practice medicine; (iii) employ or supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services. In New York, unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a professional corporation authorized to practice medicine; (iii) employ or supervise physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

25.     Pursuant to the No-Fault Laws, health care service providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting, which is prohibited by, inter alia, New York's Education Law.

26.     Additionally, New York law requires that the shareholders of a medical professional corporation be engaged in the practice of medicine through the professional corporation in order for it to be lawfully licensed. Under the No-Fault Laws, professional corporations are not eligible to receive No-Fault Benefits if they are owned by physicians who do not engage in the practice of medicine through the professional corporation.

27.    The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York ...

(emphasis supplied)

28.    Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for or collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.11, provides, in pertinent part, as follows

> An insurer shall pay benefits for any element of loss .... <u>directly</u> to the applicant or, ... upon assignment by the applicant .... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law... .

(emphasis supplied)

29.    For a healthcare provider to be eligible to bill for and to collect charges from an Insurer for radiology services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, a professional service corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who are not employees of the professional corporation, such as independent contractors.

30.    Pursuant to N.Y. Ins. Law § 403, all bills submitted by a healthcare provider to GEICO and all other insurers must be verified by the healthcare provider subject to – in substance – the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime … .

## II.    The Workers Compensation Fee Schedule and Radiology Ground Rules

31.    The New York Workers Compensation Fee Schedule (the "Fee Schedule") sets forth the fees that healthcare providers may charge in exchange for providing radiology services and other No-Fault Benefits to Insureds.

32.    The Fee Schedule regarding radiology services sets forth specific ground rules that healthcare providers are required to follow when seeking reimbursement from insurers.

33.    Ground Rule 6, entitled "Specific Billing Instructions", states that the "listed values are for the technical component plus the professional component" and indicates that "Total reimbursement for the professional and technical components shall not exceed the listed value for the total procedure, regardless of sites where the services are rendered." Ground Rule 6: (i) defines the "professional component" as the value of the professional radiological services provided by the physician, including the reading and interpretation of a film as well as the preparation of a report; and (ii) defines the "technical component" as the charges for the performance of the actual procedure (i.e., the actual performance of the scan by a technician using the pertinent radiology equipment, such as an MRI or x-ray machine).

34.    Within the radiology section of the Fee Schedule, Current Procedural Terminology ("CPT") codes allocate a certain percentage of each radiology service to the technical component and a certain percentage to the professional component. For example, if a healthcare provider were to bill an insurer for performing a lumbar MRI using CPT code 72148, 20 percent of the charges would be allocated to the professional component and 80 percent of the

11

charges would be allocated to the technical component. Thus, if a healthcare provider were to reside in Region 4 (where the PC Defendants are located), and billed for the performance of the lumbar MRI at $912.00 per the Fee Schedule, only $182.40 of the charge would be reimbursable to the healthcare provider for the interpretive services provided by the physician (i.e., the professional component). The remaining $729.60 would be allocated to the technical component of the service, and would be reimburseable to the healthcare provider only if the technician who performed the scan was an employee of the healthcare provider.

### III.    The Defendants' Fraudulent Schemes

#### A.    Relevant Background Information

35.    This case involves a series of interrelated fraudulent schemes through which licensed physicians and healthcare professionals allow their licenses to be purchased by unlicensed individuals. These unlicensed individuals then use the medical or healthcare licenses to fraudulently incorporate professional corporations, which then are used as conduits to submit fraudulent No-Fault billing to insurers.

36.    The schemes are simple: Alon, Moshe and D. Moshe identify willing physicians – typically those without established practices or facing financial pressure – and offer to pay them a salary or other designated compensation in exchange for the use of their medical licenses. Alon, Moshe and D. Moshe then arrange with the physicians to use their licenses to incorporate one or more professional corporations.

37.    Once the professional corporations are established, Alon, Moshe and D. Alon cause the professional corporations and the physicians who purport to own them to enter into exorbitant "management," "marketing," "billing," "facility lease" and/or "equipment lease" agreements with themselves and with companies that they own and control (i.e., the Management

Defendants), and arrange to have the healthcare services billed through the professional corporations performed from a facility located at 1963 Grand Concourse, Bronx, New York, a property that they also own and control.

38.     Under the various agreements, the professional corporations commit to pay the Management Defendants amounts far exceeding their actual revenues, thereby ensuring: (i) that the professional corporations remain in constant debt to the Management Defendants; (ii) that the Management Defendants can completely own and control the day-to-day operations of the professional corporations; (iii) that the Management Defendants can exercise total supervisory authority over the professional corporations; and (iv) that the Management Defendants can siphon off all of the revenues that are generated by the billings submitted to GEICO and other insurers through the professional corporations.

39.     Alon and Moshe have been involved in these types of schemes since the late 1990s. For instance, both Alon and Moshe were named as individual defendants in <u>State Farm Mutual Automobile Insurance Company v. CPT Medical Services, PC, et. al.</u> CV 04-5045 (ILG)(ALC) (the "CPT Action") (a copy of the amended complaint in the CPT Action is annexed hereto as Exhibit "3").

40.     In the CPT Action, State Farm Mutual Automobile Insurance Company ("State Farm") alleges that Alon and Moshe secretly and illegally owned and controlled several professional corporations called Bronx Advanced Medical, P.C., East Coast Medical Care, P.C. and Queens Boulevard Medical, P.C., and siphoned off virtually all of the proceeds that those professional corporations realized through management companies that they owned and controlled, including Highcrome and World Trade. (<u>See</u> Exhibit "3" at ¶¶ 41, 42, 142, 148, 153, 161).

41.     Similarly, Moshe was named as an individual defendant in <u>Travelers Indemnity</u> <u>Company v. Liberty Medical Imaging Associates, PC, et. al.</u>, CV 07 2519 (CPS)(JO) (the "Liberty Action") (a copy of the complaint in the Liberty Action is annexed hereto as Exhibit "4").

42.     In the Liberty Action, Travelers Indemnity Company alleged that Moshe, along with other unlicensed individuals, secretly and illegally owned and controlled a professional corporation called Big Apple Medical Diagnostic, P.C., and siphoned off virtually all of the proceeds that that professional corporation realized through management companies that he owned and controlled, including World Trade. (<u>See</u> Exhibit "4" at ¶¶ 40-46, 86-97).

43.     Most recently, in <u>State Farm Mutual Automobile Insurance Company v. Bronx</u> <u>Healthcare Medical, P.C., et al.</u>, CV 08-4912 (LDW)(ARL) (the "Bronx Healthcare Action") (a copy of the complaint in the Bronx Healthcare Action is annexed hereto as Exhibit "5"), State Farm alleged that Alon and Moshe secretly and illegally owned and controlled several professional corporations called Bronx Healthcare Medical, P.C. ("Bronx Healthcare"), Precise Acupuncture of N.Y., P.C. ("Precise"), J. Martinez Medical Care, P.C. ("JMMC"), and NHP, itself. (<u>See</u> Exhibit "5", <u>passim</u>).

44.     In the Bronx Healthcare Action, State Farm further alleged that Alon and Moshe siphoned off virtually all of the proceeds that Bronx Healthcare, Precise, NHP, and JMMC realized through management companies that they owned and controlled. (Exhibit "5" at ¶¶ 16-19, 29-30).

45.     State Farm also alleged in the Bronx Healthcare Action that Bronx Healthcare, Precise, and NHP operated from the 1963 Grand Concourse address that is owned and controlled by Moshe, Alon, and D. Alon, that Dr. Sawhney served as the nominal or "paper" owner of

14

Bronx Healthcare Medical, P.C., and that Dr. Rothpearl served as the nominal or "paper" owner of NHP. (Exhibit "5" at ¶¶ 3-5).

### B.     The Fraudulent Incorporation and Operation of NHP

### 1.     The Rothpearl Years

46.     The Management Defendants' most recent scheme commenced in early 2005, when they "purchased" Dr. Rothpearl's medical license in order to fraudulently incorporate NHP.

47.     In order to circumvent New York law and to induce the Department of Education to issue certificates of authority permitting NHP to engage in the practice of medicine, the Management Defendants entered into a secret scheme with Dr. Rothpearl. In exchange for a designated salary or other form of compensation, Dr. Rothpearl agreed to falsely represent in the certificates of incorporation filed with the Department of Education in 2005 and in the biennial filings made thereafter that he was the true shareholder, director and officer of NHP and that he truly owned, controlled and practiced through the professional corporation.

48.     Dr. Rothpearl never was the true shareholder, director, or officer of NHP, and never had any true ownership interest in the professional corporation. True ownership of NHP at all times has rested entirely with the Management Defendants, who have used the façade of NHP to do indirectly what they are forbidden from doing directly, namely: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

49.     Throughout the course of Dr. Rothpearl's relationship with the Management Defendants, Dr. Rothpearl exercised absolutely no control over NHP. All decision-making authority relating to the operation and management of NHP was vested entirely with the Management Defendants.

15

50.     In addition, Dr. Rothpearl never controlled or maintained any of NHP's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of NHP's financial affairs; never hired or supervised any of NHP's employees or independent contractors; and was completely unaware of the most fundamental aspects of how NHP operates.

51.     The only thing that Dr. Rothpearl did during his tenure as paper owner of NHP under the Management Defendants' control was to read and interpret films. In reality, Dr. Rothpearl never was anything more than a de facto employee of the Management Defendants.

52.     To conceal their true ownership and control of NHP while simultaneously effectuating pervasive, total control over its operation and management, the Management Defendants arranged to have Dr. Rothpearl and NHP enter into a series of "management," "marketing," "billing," "facility lease" and/or "equipment lease" agreements with USDx, Highcrome, Concourse Holdings, World Trade, and NYIC. These agreements called for exorbitant payments from NHP to either USDx, Highcrome, Concourse Holdings, World Trade, or NYIC in amounts far exceeding NHP's actual revenues, for the alleged performance of certain designated services including management, marketing, billing, and collections – as well as for facility and equipment lease – regardless of: (i) the volume of NHP's business; or (ii) the income generated by the professional corporation.

53.     While these agreements ostensibly were created to permit the Management Defendants to provide "management," "marketing," and "billing" services, as well as "facility lease" and/or "equipment lease", they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own NHP; and (ii) to siphon away all of the revenues that were generated by

the billings submitted to GEICO and other insurers through NHP. The following is an example of some of the payments made by NHP pursuant to the agreements between NHP and the Management Defendants:

| Company | Primary Owner | Average Annual Payments |
|---|---|---|
| NYIC | Dror Alon | $480,000.00 for marketing |
| Concourse Holdings | Moshe | $200,000.00 for facility lease and $191,000.00 for equipment lease. |
| US Diagnostics | Alon | $1,500,000.00 for administrative services |

54.     The net effect of these agreements between Dr. Rothpearl, NHP, and the Management Defendants was to maintain NHP in a constant state of debt to the Management Defendants, thereby enabling them to maintain total control over the professional corporation, its account receivables, and any revenues that might be generated therefrom.  The Management Defendants' scheme proved successful as: (i) NHP constantly was in debt to the Management Defendants; (ii) the bulk of the income generated by NHP in every year went to pay the Management Defendants; and (iii) Dr. Rothpearl never realized any W-2 income in any of the years that NHP operated.

55.     To further facilitate the Management Defendants' unlawful ownership of and control over NHP, on about September 6, 2005 Alon and Moshe incorporated USDx and listed its principal place of business as the 1963 Grand Concourse location from which NHP operates. Three weeks later, the Management Defendants caused NHP to file a d/b/a application for the name "US Diagnostics" – a name that is virtually identical to USDx.

17

56.     Then, the Management Defendants caused USDx and NHP to use the same telephone number, a line staffed either by themselves or by individuals under their direct control.

## 2.     The Ushyarov Years

57.     In 2008, after insurers began to request additional verifications regarding the billing submitted through NHP, the Management Defendants grew concerned that insurers were becoming aware of the fact that Dr. Rothpearl was not the true owner of NHP. Accordingly, they began to search for a new physician who could take Dr. Rothpearl's place as NHP's nominal owner and serve as a front for their unlawful scheme.

58.     The Management Defendants did not consult with Dr. Rothpearl in making the decision to transfer nominal ownership of NHP to another physician. Rather, they simply told Dr. Rothpearl that he would be replaced as the nominal owner of NHP, but that they would continue to pay him to read and interpret films. Dr. Rothpearl acquiesced, in keeping with the fact that he did not actually own NHP in the first instance, and the only role he ever had at the professional corporation was to read and interpret films as the Management Defendants' employee.

59.     In late 2008, the Management Defendants located Dr. Ushyarov and – in exchange for a designated salary or other form of compensation – persuaded him to take Dr. Rothpearl's place as nominal or "paper" owner of NHP.

60.     Toward that end, in October 2008 Dr. Ushyarov agreed to sign a share transfer agreement provided by the Management Defendants, whereby Dr. Rothpearl's shares in NHP were transferred to Dr. Ushyarov. Despite the fact that the accounts receivable for NHP potentially were worth millions of dollars, Dr. Ushyarov did not pay Dr. Rothpearl any significant amount of money to acquire the shares in NHP, did not invest any of his own money in order to own or operate NHP, and did not review any of NHP's books or records prior to

obtaining Dr. Rothpearl's shares in NHP pursuant to the share transfer agreement provided by the Management Defendants.

61. Furthermore, prior to entering into the share transfer agreement, Dr. Ushyarov did not review the "management," "marketing," "billing," "facility lease" and/or "equipment lease" agreements between NHP and the Management Defendants.

62. The share transfer agreement did not affect NHP's pre-existing, exorbitant obligations to the Management Defendants under the "management," "marketing," "billing," "facility lease" and/or "equipment lease" agreements. Rather, NHP's exorbitant obligations to the Management Defendants under the "management," "marketing," "billing," "facility lease" and/or "equipment lease" agreements continued despite the fact that Dr. Ushyarov had assumed paper ownership of NHP in place of Dr. Rothpearl.

63. When the Management Defendants provided Dr. Ushyarov with the share transfer agreement, they also told him to sign the paperwork that would be filed with the New York licensing authorities evidencing the transfer of NHP shares from Dr. Rothpearl.

64. Throughout the course of his relationship with NHP and the Management Defendants, Dr. Ushyarov – like Dr. Rothpearl before him – has exercised absolutely no real control over or any true ownership in NHP. Rather, all decision-making authority relating to the operation and management of NHP continues to be vested entirely with the Management Defendants.

65. Like Dr. Rothpearl before him, Dr. Ushyarov never has controlled or maintained any of NHP's books or records, including its bank accounts; never has selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of NHP's financial affairs; never has hired or supervised any of NHP's employees or independent

contractors; and has been completely unaware of the most fundamental aspects of how NHP operates.

66.     In reality, Dr. Ushyarov – like Dr. Rothpearl before him – is nothing more than a de facto employee of the Management Defendants.

67.     However, unlike Dr. Rothpearl, Dr. Ushyarov did not read or interpret films at NHP because, unlike Dr. Rothpearl, Dr. Ushyarov is not a radiologist. Rather, the only service Dr. Ushyarov ever has provided in his capacity as a de facto employee of the Management Defendants has been to serve as NHP's nominal owner and thereby conceal the Management Defendants' secret, unlawful ownership of the professional corporation. In fact, NHP essentially stopped performing radiology services on patients shortly after the execution of the share transfer agreement, and was replaced by IDF, leaving NHP as nothing more than a "collection" vehicle for pre-existing billing through which the proceeds from collection activity were siphoned back to the Management Defendants.

### C.     The Fraudulent Incorporation and Operation of IDF

68.     In 2008, after insurers began to request additional verification regarding NHP, including the examination under oath of its nominal or "paper" owner, Dr. Rothpearl, Alon, Moshe, USDx, and Concourse Holdings decided to fraudulently incorporate a second radiology practice to take the place of NHP at the 1963 Grand Concourse Facility in an attempt to avoid insurer investigations.

69.     In essence, Alon, Moshe, USDx, and Concourse Holdings simply swapped out IDF for NHP, which permitted them to stop submitting billing through NHP while simultaneously maintaining their overall fraudulent revenue stream.

70. As noted above, Alon and Moshe already were acquainted with Dr. Sawhney, who served as the nominal or "paper" owner of Bronx Healthcare, a professional corporation they secretly owned and controlled and used to make large volumes of fraudulent radiology referrals to NHP from 2006 through 2008. (See Exhibit "5").

71. Accordingly, Alon, Moshe, USDx, and Concourse Holdings approached Dr. Sawhney and offered him the opportunity to become the nominal or "paper" owner of IDF in exchange for a designated salary or other form of compensation.

72. Dr. Sawhney agreed, and in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing IDF to practice medicine, Dr. Sawhney further agreed in mid-2008 to falsely represent in the certificate of incorporation filed with the Department of Education and the biennial statements filed thereafter that he is the true shareholder, director and officer of IDF and that he truly owns, controls and practices through the professional corporation.

73. Other than providing his license to Alon, Moshe, USDx, and Concourse Holdings, Dr. Sawhney had no role whatsoever in starting IDF. Rather, Dr. Sawhney was in India when IDF was fraudulently incorporated in July 2008, and remained in India through October 2008.

74. Dr. Sawhney did not provide any of the money used to establish IDF.

75. Alon, Moshe, USDx, and Concourse Holdings incorporated IDF using an accountant they selected, not an accountant Dr. Sawhney selected.

76. Once IDF was fraudulently incorporated, it began to operate from the 1963 Grand Concourse facility, using the same telephone number as both NHP and USDx, the same billing company as NHP, and the same imaging equipment as NHP which – like the 1963 Grand Concourse facility itself – is owned by the Management Defendants.

77.    Dr. Sawhney is not the true shareholder, director, or officer of IDF, and has no true ownership interest in the professional corporation. True ownership of IDF at all times has rested entirely with Alon, Moshe, USDx, and Concourse Holdings, who use the façade of IDF to do indirectly what they are forbidden from doing directly, namely: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

78.    Throughout the course of Dr. Sawhney's relationship with Alon, Moshe, USDx, and Concourse Holdings, Dr. Sawhney has exercised absolutely no control over IDF. All decision-making authority relating to the operation and management of IDF has been vested entirely with Alon, Moshe, USDx, and Concourse Holdings.

79.    In addition, Dr. Sawhney never has controlled or maintained any of IDF's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of IDF's financial affairs; never hired or supervised any of IDF's employees or independent contractors; and has been completely unaware of the most fundamental aspects of how IDF operates. In reality, Dr. Sawhney is nothing more than a de facto employee of Alon, Moshe, USDx, and Concourse Holdings.

80.    Dr. Sawhney does not even read or interpret films at IDF, because he is not a radiologist. Rather, the only service Dr. Sawhney ever has provided in his capacity as a de facto employee of Alon, Moshe, USDx, and Concourse Holdings has been to serve as IDF's nominal owner, and thereby conceal Alon, Moshe, USDx, and Concourse Holdings' secret, unlawful ownership and control of the professional corporation.

81.    In order to facilitate Alon, Moshe, USDx, and Concourse Holdings' unlawful ownership and control over IDF, Dr. Sawhney has provided Alon, Moshe, USDx, and Concourse Holdings with a stamp of his signature and has given them unfettered authority to use the signature stamp as they please to conduct IDF's affairs.

82.    To conceal their true ownership and control of IDF while simultaneously effectuating pervasive, total control over its operation and management, Alon, Moshe, USDx, and Concourse Holdings arranged to have Dr. Sawhney and IDF enter into a series of "management," "marketing," "billing," "facility lease" and/or "equipment lease" agreements with USDx, Concourse Holdings, and other entities owned by or associated with Alon, Moshe, USDx, and Concourse Holdings.

83.    These agreements call for exorbitant payments from IDF, in amounts far exceeding IDF's actual revenues, for the alleged performance of certain designated services including management, marketing, billing, and collections, as well as for facility and equipment lease, regardless of: (i) the volume of IDF's business; or (ii) the income generated by the professional corporation.

84.    These agreements were prepared by Alon, Moshe, USDx, and Concourse Holdings and their attorneys, and Dr. Sawhney was not given the opportunity to negotiate the terms of the agreements or to modify their terms in any manner.

85.    While these agreements ostensibly were created to permit Alon, Moshe, USDx, and Concourse Holdings and their associates to provide "management," "marketing," "billing," "facility lease" and/or "equipment lease" services, they actually are used solely as a tool to permit Alon, Moshe, USDx, and Concourse Holdings to: (i) control the day-to-day operations, exercise

supervisory authority over, and illegally own IDF; and (ii) to siphon all of the revenues that were generated by the billings submitted to GEICO and other insurers through IDF.

86.     The net effect of these agreements between Dr. Sawhney, IDF, Alon, Moshe, USDx, and Concourse Holdings and their associates is to maintain IDF in a constant state of debt to Alon, Moshe, USDx, and Concourse Holdings, thereby enabling them to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

87.     For example, during 2009 alone, IDF realized revenues in excess of $2,500,000.00. Of this amount, Dr. Sawhney received a mere $10,000.00 – less than one-half of one percent of the revenues generated by a professional corporation that he purports to own.

88.     Between January 1, 2010 and July 1, 2010, IDF realized revenues of more than $2,100,000.00, of which Dr. Sawnhey received only about $33,000.00, or only one and a half percent of the revenues of a professional corporation he supposedly owns.

89.     The bulk of the remaining money was siphoned off by Alon, Moshe, USDx, Concourse Holdings and their associates. For example, between January 2009 and July 2010:

> (i)     IDF paid more than $275,000.00 to Alon, Moshe, USDx, and Concourse Holdings for the use of imaging equipment at the 1963 Grand Concourse facility, despite the fact that other professional corporations also used the same imaging equipment – Alon, Moshe, USDx, and Concourse Holdings essentially charged IDF $275,000.00 for a "time-share". Dr. Sawhney did not conduct any inquiry into the fair market value of the imaging equipment prior to entering into the equipment lease agreements, and in fact IDF could have purchased that equipment in the marketplace for a fraction of what it cost to "lease" it.

> (ii)    Despite the fact that IDF already was paying Alon, Moshe, USDx, and Concourse Holdings more than $17,000.00 per month for a part-time lease of the imaging equipment, IDF committed to pay an additional $12,500.00 per month to Mega Tech, Inc., another entity associated with Alon, Moshe, USDx, and Concourse Holdings, in exchange for equipment maintenance.

24

(iii)    IDF paid more than $266,000.00 to Alon, Moshe, USDx, and Concourse Holdings for the use of the 1963 Grand Concourse facility itself – again, despite the fact that other professional corporations also used the same space at the 1963 Grand Concourse facility at the same time, so Alon, Moshe, USDx, and Concourse Holdings effectively were renting the same space several times over. Dr. Sawhney did not conduct any inquiry into the fair market value of the 1963 Grand Concourse facility lease, which in fact was worth substantially less than what IDF paid.

(iv)    IDF paid between $700,000.00 and $750,000.00 on behalf of Alon, Moshe, USDx, and Concourse Holdings for the renovation of commercial office space owned by Alon, Moshe, USDx, and Concourse Holdings that has no connection to IDF.

(v)    Alon, Moshe, USDx, and Concourse Holdings withdrew $50,000.00 from the IDF account as a "chips debit" via a Hong Kong bank – upon information and belief, this "chips debit" was used to fund Alon and Moshe's gambling expenses.

(vi)    Alon and Moshe routinely used the IDF account to pay their personal lifestyle expenses, including their personal credit card bills, day care bills for their children, their luxury automobile payments, home decorating expenses, gasoline charges, clothing purchases, and lavish entertainment and restaurant tabs. These charges, in the aggregate, exceeded $150,000.00.

(vii)    IDF paid more than $250,000.00 to entities owned by or associated with Alon, Moshe, USDx, and Concourse Holdings – including "Big Apple Marketing", "Coast Enterprises", "B.B.A. Marketing", and "Neptune Marketing" – for "marketing" services, despite the fact that IDF received no marketing services in return, and in fact received virtually all of its patient referrals from other medical practices that Alon, Moshe, USDx, and Concourse Holdings secretly and unlawfully owned and controlled.

**D.    Dr. Ushyarov's Failure to Practice Medicine Through NHP, and Dr. Sawhney's Failure to Practice Medicine Through IDF**

90.    N.Y. Bus. Corp. Law § 1507 makes clear that a physician-shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation in order for it to be lawfully licensed. Section 1507 provides as follows:

25

> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation … or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued. … All shares issued, agreements made, or proxies granted in violation of this section shall be void.

91. Legislative history confirms that the physician not only must be licensed to practice, but also must be engaged in the practice of medicine in the professional corporation. For example, in commenting on a proposed amendment to Section 1507 in 1971, the New York Department of Education stated:

> This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

(Emphasis added) (a copy of the Education Department comments are annexed hereto as Exhibit "6").

92. Though NHP and IDF purport to be radiology practices, neither Dr. Ushyarov nor Dr. Sawhney is a radiologist.

93. Since assuming nominal or "paper" ownership of NHP in October 2008, Dr. Ushyarov has not engaged in the practice of medicine through NHP. Indeed, since October 2008, not a single one of the radiology services submitted to GEICO through NHP for reimbursement actually was performed by Dr. Ushyarov. Rather, every one of the interpretive reports bear the signature of outside radiologists who were associated with NHP as independent contractors.

94. Similarly, since IDF was incorporated in July 2008, Dr. Sawhney has not engaged in the practice of medicine through IDF. Indeed, Dr. Sawhney actually left the country for at least six consecutive months following IDF's incorporation, during which period IDF operated – as

always – without his involvement and under the complete and exclusive control of the Management Defendants.

95.     Since July 2008, not a single one of the radiology services submitted to GEICO through IDF for reimbursement actually was performed by Dr. Sawhney. Rather, every one of the interpretive reports bear the signature of outside radiologists who were associated with IDF as independent contractors.

**E.     The Fraudulent Billing for Independent Contractor Services**

96.     The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, professional service corporations are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

97.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered

27

on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act..."); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "7")

98.    Dr. Rothpearl was the only physician employed by NHP between its incorporation on March 29, 2005 and October 31, 2008.

99.    Dr. Ushyarov has been the only physician employed by NHP from November 1, 2008 through the present.

100.    Dr. Sawhney has been the only physician employed by IDF from its incorporation on July 31, 2008 through the present.

101.    However, many of the radiology services billed through NHP to GEICO between March 29, 2005 and October 31, 2008 were provided by physicians other than Dr. Rothpearl. Furthermore, none of the radiology services billed through NHP to GEICO between November 1, 2008 and the present were provided by Dr. Ushyarov.

102.    In addition, none of the radiology services billed through IDF to GEICO between July 31, 2008 and the present were provided by Dr. Sawhney.

103.    Aside from the radiology services provided by Dr. Rothpearl at NHP between March 29, 2005 and October 31, 2008, all of the radiology services billed to GEICO through NHP and IDF have been performed by physicians and technicians whom the Defendants treated as independent contractors.

104.    For instance, the Defendants:

(i)     paid the physicians and technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the physicians and technicians that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the physicians and technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the physicians and technicians;

(v)     failed to withhold federal, state or city taxes on behalf of the physicians and technicians;

(vi)    compelled the physicians to pay for their own malpractice insurance at their own expense;

(vii)   permitted the physicians and technicians to set their own schedules and days on which they desired to perform services;

(viii)  permitted the physicians and technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)    failed to cover the physicians and technicians for either unemployment or workers' compensation benefits; and

(x)     filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians and technicians were independent contractors.

105.    By electing to treat the physicians and technicians other than Dr. Rothpearl at NHP between March 29, 2005 and October 31, 2008 as independent contractors, the Defendants realize significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit the income tax owed by the physicians and technicians as required by 26 U.S.C. § 3102;

(ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)    avoiding payment of workers' compensation insurance to cover the physicians and technicians as required by New York Workers' Compensation Law § 10;

(v)    avoiding the need to secure any malpractice insurance to cover the physicians; and

(vi)    avoiding claims of agency-based liability arising from the physicians' and technicians' work.

106.    Because the physicians and technicians at NHP and IDF, other than Dr. Rothpearl at NHP between March 29, 2005 and October 31, 2008, have been independent contractors and have performed the radiology services, NHP and IDF never had any right to bill for or collect No-Fault Benefits in connection with those services.

107.    The Defendants billed for the radiology services as if they were provided by actual employees of NHP and IDF to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay NHP and IDF, when in fact GEICO was not.

**F.    The Fraudulent NF-3 Forms Submitted to GEICO**

108.    To support the fraudulent radiology charges, statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 Forms) consistently have been submitted to GEICO by and on behalf of the Defendants seeking payment for services for which NHP and IDF are ineligible to receive payment.

109.    The NF-3 forms submitted to GEICO by and on behalf of NHP and IDF are false and misleading in the following material respects:

(i)    The NF-3 forms uniformly misrepresent to GEICO that NHP and IDF are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12).

30

In fact, NHP and IDF are not properly licensed in that they are medical professional corporations that were fraudulently incorporated and have been owned and controlled by the Management Defendants, who are not physicians.

(ii)     The NF-3 forms uniformly misrepresent to GEICO that NHP and IDF are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12). In fact, NHP and IDF are not properly licensed in that they are medical professional corporations that engage in unlawful fee splitting with the Management Defendants, who are not physicians.

(iii)    Aside from NF-3 forms relating to NHP from the period between March 29, 2005 and October 31, 2008, when Dr. Rothpearl served as NHP's nominal owner, the NF-3 forms uniformly misrepresent to GEICO that NHP and IDF are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12). In fact, NHP and IDF are not properly licensed in that the physicians who purport to own the professional corporations do not actually practice medicine through the professional corporations.

(iv)    Aside from NF-3 forms relating to services performed by Dr. Rothpearl at NHP between March 29, 2005 and October 31, 2008, the NF-3 forms uniformly misrepresent to GEICO that NHP and IDF are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.11 for the radiology services that were performed. In fact, NHP and IDF are not eligible to seek or pursue collection of No-Fault Benefits associated with the radiology services because the services were not provided by employees of NHP and IDF.

(Representative samples of the fraudulent bills are annexed hereto as Exhibit "8").

## IV.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

110.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to GEICO.

111.    To induce GEICO to promptly pay the fraudulent charges, the Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment.

31

112. Specifically, they knowingly have misrepresented and concealed facts related to NHP and IDF in an effort to prevent discovery that the professional corporations are unlawfully incorporated, owned and controlled by non-medical professionals and engage in fee splitting, and therefore are ineligible to bill for or collect No-Fault Benefits. For example, the Defendants misrepresented the Nominal Owner Defendants' ownership of and control over NHP and IDF in filings with the New York State Department of Education, so as to induce the New York State Department of Education to issue the licenses required to permit medicine to be practiced through NHP and IDF. Additionally, the Management Defendants entered into complex financial arrangements with NHP and/or IDF that were designed to, and did, conceal their true ownership of and control over NHP and/or IDF.

113. Likewise, in every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly misrepresented that NHP and/or IDF properly were incorporated, lawfully licensed, and eligible to bill for and collect No-Fault Benefits, when in fact they were not.

114. In addition, in every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly misrepresented that the technical component of the radiology services allegedly performed through NHP or IDF was performed by employees of either NHP or IDF, when in fact the technicians were not employees of either NHP or IDF. In most instances, the Defendants also misrepresented that the professional component of the radiology services allegedly performed through NHP or IDF was performed by employees of either NHP or IDF, when in fact it was performed by radiologists who worked as independent contractors.

32

115.    Moreover, in most of the bills that the Defendants submitted or caused to be submitted, the Defendants misrepresented that the physicians who purported to own NHP and IDF actually practiced medicine through NHP and IDF.

116.    Furthermore, the Defendants created separate professional corporations with different tax identification numbers in order to reduce the amount of billing submitted through any single professional corporation, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity. However, the Defendants operated the separate professional corporations as a single entity, from a single location, using a single telephone number and identical independent contractors.

117.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

118.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,500,000.00 based upon the fraudulent charges representing payments made by GEICO on or after April 4, 2002.

119.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against NHP
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

120.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 119 above.

121.    There is an actual case in controversy between GEICO and NHP regarding more than $650,000.00 in fraudulent billing for radiology services that has been submitted to GEICO.

122.    NHP has no right to receive payment for any pending bills submitted to GEICO because it is fraudulently incorporated and are owned and controlled by persons not licensed to practice medicine in New York State, and therefore, is ineligible to seek or recover No-Fault Benefits.

123.    NHP has no right to receive payment for any pending bills submitted to GEICO because the professional corporation engaged in unlawful fee-splitting.

124.    NHP has no right to receive payment for any pending bills submitted to GEICO to the extent that those bills seek payment for the technical component of all radiology services billed to GEICO, because the services were not provided by employees of the professional corporation that submitted the billing.

125.    NHP has no right to receive payment for any pending bills submitted to GEICO for the professional component of all radiology services billed to GEICO, to the extent that the professional component of the services was not provided by Dr. Rothpearl at NHP between March 29, 2005 and October 31, 2008, because the services were not provided by employees of the professional corporation that submitted the billing.

126.    Other than bills relating to services performed at NHP during the period between March 29, 2005 and October 31, 2008, when Dr. Rothpearl served as NHP's nominal owner,

34

NHP has right to receive payment for any pending bills submitted to GEICO because it was not owned by physicians who actually practiced through the professional corporations.

127.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     NHP has no right to receive payment for any pending bills submitted to GEICO because the professional corporation is fraudulently incorporated, owned and/or controlled by non-physicians and, therefore, is ineligible to seek or recover no-fault benefits.

(ii)    NHP has no right to receive payment for any pending bills submitted to GEICO because the professional corporation engaged in unlawful fee-splitting with non-physicians.

(iii)   NHP has no right to receive payment for any pending bills to the extent that those bills seek payment for the technical component of all radiology services billed to GEICO, because the services were not provided by individuals employed by the professional corporation that submitted the billing;

(iv)    with the exception of services performed by Dr. Rothpearl at NHP between March 29, 2005 and October 31, 2008, NHP has no right to receive payment for any pending bills submitted to GEICO, to the extent that those bills seek payment for the professional component of all radiology services billed to GEICO, because the services were not provided by individuals employed by the professional corporation; and

(v)     with the exception of bills relating to services performed at NHP during the period between March 29, 2005 and October 31, 2008, NHP has no right to receive payment for any pending bills submitted to GEICO because the physician who purports to own the professional corporation did not actually practice through the professional corporations.

**SECOND CAUSE OF ACTION**
**Against Dr. Rothpearl, Dr. Ushyarov, and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

128.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 127 above.

129.    New Hyde Park Imaging, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

130.    Dr. Rothpearl, Dr. Ushyarov, Alon, Moshe, D. Alon, USDx, Highcrome, Concourse Holdings, World Trade and NYIC knowingly have conducted and/or participated, directly or indirectly, in the conduct of NHP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payment for radiology services that NHP was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) it billed for services performed by independent contractors; and (iv) it was not owned by a physician who actually practiced through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

131.    NHP's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Rothpearl, Dr. Ushyarov, and the Management Defendants operate NHP, insofar as NHP never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for NHP to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

132. The Defendants continue to submit and attempt collection on the fraudulent billing.

133. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,250,000.00 Dollars pursuant to the fraudulent bills submitted by the Defendants through NHP since April 4, 2002.

134. By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Dr. Rothpearl, Dr. Ushyarov, and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

135. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 134 above.

136. New Hyde Park Imaging, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

137. Dr. Rothpearl, Dr. Ushyarov, Alon, Moshe, D. Alon, USDx, Highcrome, Concourse Holdings, World Trade and NYIC are employed by and/or associated with the NHP enterprise.

138. Dr. Rothpearl, Dr. Ushyarov, and the Management Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the NHP enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to GEICO and other insurers. These

acts of mail fraud include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

139.    Dr. Rothpearl, Dr. Ushyarov, and the Management Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

140.    GEICO has been injured in its business and property by reason of the above-described conduct of Dr. Rothpearl, Dr. Ushyarov, and the Management Defendants in that it has paid at least $2,250,000.00 pursuant to the fraudulent bills submitted by the Defendants through NHP since April 4, 2002.

141.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Dr. Rothpearl, Dr. Ushyarov, NHP, and the Management Defendants
### (Common Law Fraud)

142.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 141 above.

143.    Dr. Rothpearl, Dr. Ushyarov, NHP, Alon, Moshe, D. Alon, USDx, Highcrome, Concourse Holdings, World Trade and NYIC intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for radiology services.

38

144.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that NHP is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that NHP is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engages in the illegal splitting of fees with non-physicians; (iii) in many claims, the representation that NHP is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact NHP is not owned by a physician who actually practices through the professional corporation. (iv) in every claim, the representation that the technical component of the radiology services billed to GEICO were performed by NHP's employees, when in fact it was performed by independent contractors; and (v) in most claims, the representation that the professional component of the radiology services billed to GEICO were performed by NHP's employees, when in fact it was performed by independent contractors.

145.     The Defendants made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

146.     GEICO justifiably relied on the Defendants' false and fraudulent representations, and as a proximate result has incurred damages of more 2,250,000.00 based upon the fraudulent charges.

147.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

148.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Dr. Rothpearl, Dr. Ushyarov, NHP and the Management Defendants
### (Unjust Enrichment)

149.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 148 above.

150.    As set forth above, Dr. Rothpearl, Dr. Ushyarov, NHP, Alon, Moshe, D. Alon, USDx, Highcrome, Concourse Holdings World Trade and NYIC have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

151.    When GEICO paid the bills and charges submitted by or on behalf of NHP for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

152.    Dr. Rothpearl, Dr. Ushyarov, NHP, and the Management Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

153.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

154.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $2,250,000.00.

## SIXTH CAUSE OF ACTION
### Against Alon, Moshe, USDx, and Concourse Holdings
### (Violation of RICO, 18 U.S.C. § 1962(c))

155.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 154 above.

156.   I.D.F. Medical Diagnostic, P.C.  is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

157.   Alon, Moshe, USDx, and Concourse Holdings knowingly have conducted and/or participated, directly or indirectly, in the conduct of IDF's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. §1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payment for radiology services that IDF was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians; (iii) it billed for services performed by independent contractors; and (iv) it was not owned by a physician who actually practiced through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

158.   IDF's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Alon, Moshe, USDx, and Concourse Holdings operate IDF, insofar as IDF never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore

41

are essential in order for IDF to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity.

159.    Alon, Moshe, USDx, and Concourse Holdings continue to submit and attempt collection on the fraudulent billing.

160.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $250,000.00 pursuant to the fraudulent bills submitted by Alon, Moshe, USDx, and Concourse Holdings through IDF since April 4, 2002.

161.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
#### Against Alon, Moshe, USDx, and Concourse Holdings
#### (Violation of RICO, 18 U.S.C. § 1962(d))

162.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 161 above.

163.    I.D.F. Medical Diagnostic, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

164.    Alon, Moshe, USDx, and Concourse Holdings are employed by and/or associated with the IDF enterprise.

165.    Alon, Moshe, USDx, and Concourse Holdings knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the IDF enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to GEICO and other insurers.  These acts of mail fraud

include, but are not limited to, those that are described in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

166.    Alon, Moshe, USDx, and Concourse Holdings knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

167.    GEICO has been injured in its business and property by reason of the above-described conduct of Alon, Moshe, USDx, and Concourse Holdings in that it has paid at least $250,000.00 pursuant to the fraudulent bills submitted by Alon, Moshe, USDx, and Concourse Holdings through IDF since April 4, 2002.

168.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### EIGHTH CAUSE OF ACTION
**Against Alon, Moshe, USDx, and Concourse Holdings**
**(Common Law Fraud)**

169.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 168 above.

170.    Alon, Moshe, USDx, and Concourse Holdings intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for radiology services.

171.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that IDF is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that IDF is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engages in the illegal splitting of fees with non-physicians; (iii) in every claim, the representation that IDF is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact IDF is not owned by a physician who actually practices through the professional corporation. (iv) in every claim, the representation that the technical component of the radiology services billed to GEICO were performed by IDF's employees, when in fact it was performed by independent contractors; and (v) in every claim, the representation that the professional component of the radiology services billed to GEICO were performed by IDF's employees, when in fact it was performed by independent contractors.

172.    Alon, Moshe, USDx, and Concourse Holdings made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted by Defendants that were not compensable under the No-Fault Laws.

173.    GEICO justifiably relied on Alon, Moshe, USDx, and Concourse Holdings' false and fraudulent representations, and as a proximate result has incurred damages of more than Two $250,000.00 based upon the fraudulent charges.

174.    Alon, Moshe, USDx, and Concourse Holdings' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

175.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Alon, Moshe, USDx, and Concourse Holdings
### (Unjust Enrichment)

176.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 175 above.

177.    As set forth above, Alon, Moshe, USDx, and Concourse Holdings have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

178.    When GEICO paid the bills and charges submitted through IDF for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Alon, Moshe, USDx, and Concourse Holdings' improper, unlawful, and/or unjust acts.

179.    Alon, Moshe, USDx, and Concourse Holdings have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

180.    Alon, Moshe, USDx, and Concourse Holdings' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

181.    By reason of the above, Alon, Moshe, USDx, and Concourse Holdings have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $250,000.00.

## JURY DEMAND

182.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that NHP has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Dr. Rothpearl, Dr. Ushyarov, Alon, Moshe, D. Alon, USDx, Highcrome, Concourse Holdings, World Trade and NYIC, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,250,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Dr. Rothpearl, Dr. Ushyarov, Alon, Moshe, D. Alon, USDx, Highcrome, Concourse Holdings, World Trade and NYIC, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,250,000.00 Dollars, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Dr. Rothpearl, Dr. Ushyarov, NHP, Alon, Moshe, D. Alon, USDx, Highcrome, Concourse Holdings, World Trade and NYIC, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$2,250,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Dr. Rothpearl, Dr. Ushyarov, NHP, Alon, Moshe, D. Alon, USDx, Highcrome, Concourse Holdings, World Trade and NYIC, more than $2,250,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Alon, Moshe, USDx, and Concourse Holdings, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $250,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.     On the Seventh Cause of Action against Alon, Moshe, USDx, and Concourse Holdings, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $250,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.     On the Eighth Cause of Action against Alon, Moshe, USDx, and Concourse Holdings, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $250,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

I.     On the Ninth Cause of Action against Alon, Moshe, USDx, and Concourse Holdings, more than $250,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:    Uniondale, New York
March 11, 2011

RIVKIN RADLER LLP

By: _____
    Barry I. Levy (BL 2190)
    Michael A. Sirignano (MS 5263)
    Max Gershenoff (MG 4648)
926 RXR Plaza
Uniondale, New York 11556-0926
Telephone:    (516) 357-3000
Facsimile:    (516) 357-3333

*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co.*

48